# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 21-1247-CFC |
| | ) | |
| CNET MEDIA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 21-1362-CFC |
| | ) | |
| BUZZFEED, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 21-1855-CFC |
| | ) | |
| IMAGINE LEARNING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

NIMITZ TECHNOLOGIES LLC,    )
                                )
        Plaintiff,          )
                                )
      v.                )   Civ. No. 22-413-CFC
                                )
BLOOMBERG L.P.,           )
                                )
        Defendant.     )

---

MEMORANDUM

Nimitz Technologies LLC has filed a petition for a writ of mandamus in the Federal Circuit, asking that court to reverse the Memorandum Order I issued in these four patent cases on November 10, 2022. Civ. No. 21-1247, D.I. 27; Civ. No. 21-1362, D.I. 21; Civ. No. 21-1855, D.I. 22; Civ. No. 22-413, D.I. 18.[1] The Federal Circuit stayed the Memorandum Order "pending further action" and directed Defendants to respond to the petition no later than November 30.

I issued the Memorandum Order *sua sponte*. The Memorandum Order directs Nimitz and its counsel to produce certain records to the Court. I stated in the Memorandum Order's first paragraph that I was ordering the production of these records because "the testimony of witnesses and representations of counsel at" a hearing I held on November 4 had "give[n] rise to concerns that include but are not limited to the accuracy of statements in filings made by [Nimitz] with the Court and whether the real parties in interest are before the Court[.]" D.I. 27 at 1. I had previously stated in the order that scheduled the November 4 hearing that I had "concerns about whether Plaintiff has complied with the Court's standing order regarding third-party litigation funding." D.I. 24 at 2. And I stated at the conclusion of the November 4 hearing that I thought the testimony adduced at the

---

[1] Unless otherwise noted, all docket citations that follow will be to Civ. No. 21-1247.

hearing gave rise to concerns about the abuse of our courts and the "lack of transparency as to who the real parties before the Court are, about who is making decisions in these types of litigation." D.I. 26 at 107:17–19. I also made very clear during the hearing—in the presence of Nimitz's counsel, George Pazuniak, and its owner, Mark Hall—that I had serious concerns that counsel had violated the Rules of Professional Conduct. I purposely did not repeat in the Memorandum Order my concerns about counsel's professionalism and potential role in the abuse of the Court because I have made no definitive conclusions about those issues, and I did not want to unnecessarily embarrass counsel; the Order's "include but are not limited to" wording was intentional. But in light of the Federal Circuit's stay order and the fact that I issued the Memorandum Order to protect important interests of this Court and not at Defendants' request, I think it prudent to explain more fulsomely and in writing the reasons I issued the Memorandum Order.

I.

The road to the Memorandum Order begins with Federal Rule of Civil Procedure 7.1. That rule requires any "nongovernmental corporate party" to file "with its first appearance, pleading, petition, motion, response, or other request addressed to the court" "a disclosure statement that: (1) identifies any parent corporation and any publicly held corporation owning 10% or more of its stock; or

2

(2) states that there is no such corporation." The Advisory Committee Notes to the Rule explain its main purpose:

> The information required [to be disclosed] by Rule 7.1(a) reflects the "financial interest" standard of Canon 3C(1)(c) of the Code of Conduct for United States Judges. This information will support properly informed disqualification decisions in situations that call for automatic disqualification under Canon 3C(1)(c).

FED. R. CIV. P. 7.1 advisory committee's notes to 2002 amendment.

The Advisory Committee recognized that Rule 7.1 "does not cover all of the circumstances that may call for disqualification under the financial interest standard, and does not deal at all with other circumstances that may call for disqualification." *Id.* For those reasons, the Committee explained in its Notes that "Rule 7.1 does not prohibit local rules that require disclosures in addition to those required by Rule 7.1" and also that "[d]eveloping experience with local disclosure practices . . . may provide a foundation for adopting more detailed disclosure requirements by future amendments of Rule 7.1." *Id.*

These comments informed my decision to issue on April 18, 2022, a Standing Order Regarding Disclosure Statements Required by Federal Rule of Civil Procedure 7.1 (the Disclosure Order). *See also* Fed. R. Civ. P. 83(b) (authorizing judges to "regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district's local rules").

3

That Order applies to all civil cases—not just patent cases—assigned to me and requires any "party [that] is a nongovernmental joint venture, limited liability corporation, partnership, or limited liability partnership, . . . [to] include in its disclosure statement filed pursuant to Federal Rule of Civil Procedure 7.1 the name of every owner, member, and partner of the party, proceeding up the chain of ownership until the name of every individual and corporation with a direct or indirect interest in the party has been identified." Disclosure Order at 1.

I am not the only district court judge in the country who requires disclosures beyond what Rule 7.1 requires. *See, e.g,* C.D. Cal. R. 7.1-1; N.D. Cal. Civil L.R. 3-15; N.D. Ga. Civ. R. 3.3; S.D. Ga. L.R. 7.1.1; N.D. & S.D. Iowa Civ. R. 7.1; D. Md. L.R. 103.3(b); E.D. Mich. L.R. 83.4; D. Nev. L.R. 7.1-1; E.D.N.C. Civ. R. 7.3; N.D. Ohio L.R. 3.13(b); S.D. Ohio Civ. R. 7.1.1; N.D. Tex. L.R. 3.1(c); W.D. Tex. Civ. R. 33. It makes sense that other courts would have these additional disclosure requirements, as it is critically important that federal judges do not suffer from conflicts that could call into question their impartiality. As Justice Holmes noted:

> It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be

> able to satisfy himself with his own eyes as to the mode
> in which a public duty is performed.

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884) (Holmes, J.). *See also* 28 U.S.C. §

455(a) (requiring federal judges to disqualify themselves "in any proceeding in

which [their] impartiality might reasonably be questioned"); § 455(b) (requiring

federal judges to disqualify themselves where they have any "interest that could be

substantially affected by the outcome of the proceeding").

The Disclosure Order also promotes the identification of the real parties in

interest in a case. "[O]ne of the essential qualities of a Court of Justice [is] that its

proceedings should be public." *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011)

(quoting *Daubney v. Cooper*, 109 Eng. Rep. 438, 441 (K.B. 1829) and citing *Nixon

v. Warner Cmmc'ns, Inc.*, 435 U.S. 589, 598–99 (1978)) (alterations in original).

"Identifying the parties to the proceeding is an important dimension of publicness.

The people have a right to know who is using their courts." *Doe v. Blue Cross &

Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997) (Posner, J.); *see also*

FED. R. CIV. P. 17(a) ("An action must be prosecuted in the name of the real party

in interest."). Federal courts are not star chambers.[2]

---

[2] The Disclosure Order has the added benefit of ensuring that subject matter
jurisdiction is present in diversity jurisdiction cases involving LLCs, whose
citizenship is based on the citizenship of its individual members. *See Lincoln*

To promote additional transparency in this Court's proceedings, I also issued on April 18, 2022, a Standing Order Regarding Third-Party Funding Arrangements (the Third-Party Funding Order). That Order, which also applies to all civil cases assigned to me, provides in relevant part:

> . . . [W]here a party has made arrangements to receive from a person or entity that is not a party (a "Third-Party Funder") funding for some or all of the party's attorney fees and/or expenses to litigate this action on a non-recourse basis in exchange for (1) a financial interest that is contingent upon the results of the litigation or (2) a non-monetary result that is not in the nature of a personal loan, bank loan, or insurance:
>
> 1.      Within the later of 45 days of this Order or 30 days of the filing of an initial pleading or transfer of the matter to this District, including the removal of a state action, the party receiving such funding shall file a statement (separate from any pleading) containing the following information:
>
> a.      The identity, address, and, if a legal entity, place of formation of the Third-Party Funder(s);
>
> b.      Whether any Third-Party Funder's approval is necessary for litigation or settlement decisions in the

---

*Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) ("[T]he citizenship of an LLC is determined by the citizenship of [each of] its members." (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010))). To that end, the Disclosure Order acts in concert with my April 18, 2022 Standing Order Regarding Disclosure of Citizenship of Organizational Entities in Diversity Cases. "Courts have long used the disclosure statement occasioned by [Rule 7.1] as a means of discerning the citizenship of corporate entities for purposes [of] diversity jurisdiction." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1198 (4th ed.) (internal footnote and citations omitted).

> action, and if the answer is in the affirmative, the nature
> of the terms and conditions relating to that approval; and
>  c.  A brief description of the nature of the
> financial interest of the Third-Party Funder(s).

Third-Party Funding Order at 1–2. Although the Third-Party Funding Order

requires the filing of a statement if third-party litigation funding exists in a case, it

does not require the filing of a negative statement that no third-party litigation

funding exists.

I modeled the Third-Party Funding Order on Local Civil Rule 7.1.1 of the

District of New Jersey's Local Rules. That rule was issued on June 21, 2021. The

Judicial Conference of the Third Circuit has neither modified nor abrogated the

Rule and therefore, by statute, the Rule remains in effect. *See* 28 U.S.C.

§ 2071(c)(1)–(2); *see also* D.N.J. L. Civ. R. 83.1. Like the District of New Jersey,

this Court is part of the Third Circuit; thus, I was (and am) confident about the

appropriateness of the Third-Party Funding Order. My confidence is reinforced by

the fact that as of 2018, six federal courts of appeals and 24 district courts had

third-party funding disclosure requirements of some kind. *See* MEETING OF THE

ADVISORY COMMITTEE ON CIVIL RULES AGENDA BOOK 209, 210 Philadelphia, P.A.

(Apr. 10, 2018) (reporting survey results showing that "[s]ix U.S. Courts of

Appeals have local rules which require identifying litigation funders" and that "of

the 94 federal district courts in the United States, 24—or roughly 25% of all U.S.

District Courts—require disclosure of the identity of litigation funders in a civil case").

II.

Nimitz filed these four patent cases and seven others in this Court between August 30, 2021 and March 30, 2022.[3]  It asserted in all 11 cases a single patent: U.S. Patent No. 7,848,328 (the #328 patent).   Mr. Pazuniak has been Nimitz's attorney of record in each case.   Nimitz voluntarily dismissed the seven other cases between December 2021 and April 2022.[4]

On May 9, 2022, I held an oral argument on motions to dismiss filed in three of the four cases at issue here: Civ. Nos. 21-1247, 21-1362, and 21-1855.   On May 13, 2022, my chambers discovered that Nimitz's Rule 7.1 disclosure statement in

---

[3] The seven other cases were: *Nimitz Techs. LLC v. Bleacher Rep., Inc.*, Civ. No. 21-1246; *Nimitz Techs. LLC v. Pinterest, Inc.*, Civ. No. 21-1248; *Nimitz Techs. LLC v. Reddit, Inc.*, Civ. No. 21-1249; *Nimitz Techs. LLC v. Conde Nast Ent. LLC*, Civ. No. 21-1360; *Nimitz Techs. LLC v. Skillshare, Inc.*, Civ. No. 21-1363; *Nimitz Techs. LLC v. Twitter, Inc.*, Civ. No. 21-1364; *Nimitz Techs. LLC v. Tastemade, Inc.*, Civ. No. 21-1856; and *Nimitz Techs. LLC v. Bloomberg L.P.*, Civ. No. 22-413.

[4] Civ. No. 21-1246, D.I. 10 (December 14, 2021); Civ. No. 21-1364, D.I. 8 (December 14, 2021); Civ. No. 21-1248, D.I. 10 (December 20, 2021); Civ. No. 21-1249, D.I. 11 (December 22, 2021); Civ. No. 21-1360, D.I. 10 (February 4, 2022); Civ. No. 21-1363, D.I. 15 (April 27, 2022); Civ. No. 21-1856, D.I. 8 (April 27, 2022).

8

the 21-1247 action did not identify any owner or member of Nimitz.  Accordingly,

I had the following oral order docketed that day:

> The parties are directed to certify within five days that
> they have complied with [the] April 18, 2022 Standing
> Order Regarding Disclosure Statements Required by
> Federal Rule of Civil Procedure 7.1.  The parties are also
> reminded of their obligation to comply with [the] April
> 18, 2022 Standing Order Regarding Third-Party Funding
> Arrangements.

May 13, 2022 Oral Order.

On May 18, 2022, CNET, the defendant in the 21-1247 action, filed an

amended disclosure statement in response to the May 13 order.  D.I. 19.  On May

23, having received no response to the May 13 order from Nimitz, I issued an order

to show cause why Nimitz should not be held in contempt for failing to comply

with the May 13 order.  D.I. 20.

Two days later, on May 25, Nimitz filed in the 21-1247 action an amended

Rule 7.1 disclosure statement in which it stated that "[t]he sole owner and member

of Nimitz Technologies LLC is Mark Hall, an individual."  D.I. 21 at 1.  Nimitz

made this same representation in three Rule 7.1 disclosure statements it filed that

same day in the other three actions at issue here.  (It turns out that Nimitz had

never filed Rule 7.1 disclosure statements in these three cases; nor did it ever file a

9

Rule 7.1 disclosure statement in four of the other seven cases. *See* Civ Nos. 21-1360, 21-1363, 21-1364, and 21-1856.)

Nimitz also filed in all four cases on May 25 responses to the Third-Party Funding Order in which it represented that "Plaintiff has not entered into any arrangement with a Third-Party Funder, as defined in the Court's Standing Order Regarding Third Party Litigation Funding Arrangements." Civ. No. 21-1247, D.I. 22; Civ. No. 21-1362, D.I. 17; Civ. No. 21-1855, D.I. 18; Civ. No. 22-413, D.I. 12.

In the meantime, I turned my attention to other matters.

## III.

On July 13, 2022, I held oral argument on a motion to dismiss filed in *Longbeam Technologies LLC v. Amazon.com, Inc.*, Civ. No. 21-1559, a case I had no reason to believe at the time was related to Nimitz's cases. Mr. Pazuniak was not counsel of record for Longbeam, and he did not attend the July 13 hearing.

At the outset of the hearing, I told Longbeam's counsel that a "Supplement" Longbeam had filed to amend its Rule 7.1 disclosure statement did not comply with the Disclosure Order because the Supplement identified Longbeam as Longbeam's owner. Civ. No. 21-1559, D.I. 37 at 3:19–4:2. That observation led to the following colloquy:

> [Longbeam's Counsel]: With Your Honor's permission, immediately following the hearing, I would be glad to

10

contact my office and update [the supplement Rule 7.1 disclosure statement] to the extent it's necessary or call back into your chambers.

THE COURT:  Well, . . . don't call back in.  This has to be on the record.  Who is Longbeam?  Who are the members of Longbeam Technologies, LLC?

[Longbeam's Counsel]:  I do not know.

THE COURT:  The defendants have no reaction to this statement[?]

[Amazon's Counsel]:  No, Your Honor.  We're not sure either.

THE COURT:  Didn't raise any objections to it?

[Amazon's Counsel]:  No.  We did not, Your Honor.

THE COURT:  Don't you want to know who's suing you?

[Amazon's Counsel]:  I think that would be helpful, yes, Your Honor.

Civ. No. 21-1559, D.I. 37 at 4:14–5:6.  I then gave Longbeam a week to again

amend its Rule 7.1 disclosure statement.

On July 20, Longbeam filed an Amended Rule 7.1 Disclosure Statement, in

which it represented that its "sole owner and only member is Sharon Bullion."

Civ. No. 21-1559, D.I. 30 at 1.  It also filed that day an Amended Statement

Regarding Third-Party Funding in which it stated that "Longbeam has not entered

11

into any funding arrangement or agreement for the payment of attorneys' fees in this case other than, to the extent applicable, its retainer agreement with outside counsel of record, Daignault Iyer LLP." Civ. No. 21-1559, D.I. 31 at 1.

On July 25, Amazon filed an objection to Longbeam's amended disclosure and third-party funding statements. Civ. No. 21-1559, D.I. 33. Amazon faulted the statements "for their failure to disclose Longbeam's apparent relationship with patent monetization entity IP Edge." Civ. No. 21-1559, D.I. 33 at 1. In Amazon's words:

> Longbeam's disclosures make no mention of IP Edge, but its own administrative filings, as well as public reporting, confirm that Longbeam is an extension of IP Edge. Longbeam's patent assignment, excerpted and recorded with the United States Patent and Trademark Office, confirms that the correspondence address for Longbeam is an "@ip-edge.com" email address. Independent news reports have confirmed that "IP Edge has continued to form additional entities . . . among them . . . Longbeam Technologies LLC" and that this litigation specifically represents "a brand-new campaign run by IP Edge." The latter is notable given that a principal of IP Edge is a contributor to the same media outlet.
>
> Longbeam's failure to disclose its connection to IP Edge is concerning, given IP Edge's established practice of "the naming of individuals, seemingly with no prior connection to monetization, as managers or members of its various LLCs" to avoid disclosure of its real interests, in defiance of the purpose of this Court's standing disclosure orders. As the Court noted, this structure prevents Amazon from having any understanding of who

12

> is actually suing it, and who is making strategic litigation
> decisions for Longbeam.

Civ. No. 21-1559, D.I. 33 at 1–2 (citations and alterations omitted).

Amazon attached to its objection two exhibits that bear on the Memorandum

Order. The first is an assignment of the patents asserted by Longbeam against

Amazon that was recorded in the United States Patent and Trademark Office

(PTO) on October 29, 2021—three days before Longbeam filed its lawsuit in this

Court. Civ. No. 21-1559, D.I. 34-1, Ex. A. Longbeam is identified in the

assignment as the assignee. Civ. No. 21-1559, D.I. 34-1 at 2. Sharon Bullion

signed the assignment on Longbeam's behalf and is identified in the assignment as

Longbeam's managing member. She is also identified as the "submitter" of the

patent assignment to the PTO. Civ. No. 21-1559, D.I. 34-1 at 2. The email

address provided for the submitter is linhd@ip-edge.com. Civ. No. 21-1559,

D.I. 34-1 at 2.

The second exhibit is a May 22, 2022 article titled "Plaintiff Newly

Assigned to Judge Connolly's Courtroom Amends Its Prior Disclosure" that

appears to have been published by RPX Corporation. Civ. No. 21-1559, D.I. 34-1,

Ex. E. Noteworthy here is the fact that the article identifies Mark Hall, Sally

Pugal, and Lori LaPray each as a managing member of different LLCs that had

been assigned IP Edge-related patents. Civ. No. 21-1559, D.I. 34-1 at 28.

13

According to the article, each of the LLCs was "formed just prior" to transfers of patents to the LLCs, after which each LLC "launched a litigation campaign over its received assets." Civ. No. 21-1559, D.I. 34-1 at 28.

Amazon argued in its objection that "Longbeam's obfuscation prevent[ed] Amazon from meaningfully assessing whether Longbeam has standing to bring this action"; and it asked me to order "early discovery limited to this threshold issue of standing, including the production of relevant documents and a deposition of Longbeam principals on the nature and extent of IP Edge's interests in this litigation and the asserted patents, while staying discovery on other issues." Civ. No. 21-1559, D.I. 33 at 2–3.

Longbeam argued in a response to Amazon's objection that the recordation at the PTO of the assignment to Longbeam of the patents it had asserted against Amazon "provide[d] conclusive evidence that Plaintiff Longbeam has standing to bring this action." Civ. No. 21-1559, D.I. 36 at 1. Notably, nowhere in its response did Longbeam deny Amazon's assertions that Longbeam was simply "an extension of IP Edge," that IP Edge forms entities like and including Longbeam as part of a litigation campaign, and that IP Edge engages in a practice of naming individuals with no prior connection to patent monetization as managers or members of its various LLCs to avoid disclosure of its real interests in defiance of

14

the purpose of the Disclosure and Third-Party Funding Orders.  Nor did Longbeam

challenge in any way the accuracy of the RPX Corporation article.

On August 17, I docketed an oral order granting Amazon's discovery and

stay requests based on "concerns about Longbeam's standing to pursue this action

and whether it has complied with the Court's standing order regarding third-party

litigation funding arrangements."  Civ. No. 21-1559, Aug. 17, 2022 Oral Order.  I

then moved on to other matters.

IV.

On August 25, I turned my attention to a motion filed by Jimmy Chong,

Esquire, to withdraw as counsel for Missed Call, LLC in three patent cases: *Missed*

*Call, LLC v. Freshworks, Inc.*, Civ. No. 22-739; *Missed Call, LLC v. Talkdesk,*

*Inc.*, Civ. No. 22-740; and *Missed Call, LLC v. Twilio Inc.*, Civ. No. 22-742.  I had

no reason at the time to believe the Missed Call cases were related in any way to

the Nimitz cases.  I would soon learn otherwise.

Mr. Chong has been a prolific filer of patent cases in our court.  According

to our CM/ECF records, he has filed more than 770 patent cases in this district

since January 1, 2019.

The motion in question, signed by Mr. Chong, was not your typical

withdrawal motion:

15

> . . . Plaintiff Missed Call, LLC, by and through its
> undersigned counsel, respectfully request[s] to the
> withdrawal of counsel of Jimmy Chong, Esq[.], from the
> Chong Law Firm, P.A. for Plaintiff Missed Call, LLC in
> the above-captioned matters. The Plaintiff will continue
> to be represented by out-of-state counsel, William P.
> Ramey, III, Esquire, from the Ramey LLP and out-of-
> state counsel's firm is presently seeking new Delaware
> Local Counsel. Out[-]of[-]state counsel initially stated
> that multiple firms are able to act as local counsel;
> however, no firm has been presented as new Delaware
> Counsel to date. Good cause exists for the withdrawal as
> counsel, in that attorney is unable to effectively
> communicate with Client in a manner consistent with
> good attorney-client relations. Withdrawal can be
> accomplished without material adverse effect on the
> interests of Plaintiff. There is no objection to the
> withdrawal by the Ramey LLP.
>
> The Plaintiff has been forwarded a copy of this
> Motion[.]

Civ. No. 22-739, D.I. 16 at 1–2; Civ. No. 22-740, D.I. 12 at 1–2; Civ. No. 22-742,

D.I. 9 at 1–2.

The motion presented an immediate problem. Mr. Ramey had been admitted

*pro hac vice* in the Missed Call cases. But under Local Rule 83.5(d) he could not

continue to "be admitted *pro hac vice* in this Court unless [he was] associated with

an attorney who is a member of the Bar of this Court and who maintains an office

in the District of Delaware for the regular transaction of business." Furthermore,

Rule 83.5(d) requires that all filings be made by Delaware counsel. Thus, unless

16

and until another Delaware lawyer entered an appearance on behalf of Missed Call, I did not see how I could grant Missed Call's motion to withdraw Mr. Chong as its counsel.  The cryptic language in one sentence of the motion—"[g]ood cause exists for the withdrawal as counsel, in that attorney is unable to effectively communicate with Client in a manner consistent with good attorney-client relations"—also raised alarm bells.  Accordingly, I issued an order on the afternoon of August 25 setting a hearing on the withdrawal motion for September 1.  I expressly stated in the August 25 order that both Mr. Chong and Mr. Ramey were required to attend the hearing in person.

By the time September 1 came around, Mr. Chong had filed motions to withdraw in 15 patent cases in which he acted as Delaware counsel for an LLC that was also represented by Mr. Ramey.[5]  Six of those cases (including the three Missed Call cases) were assigned to me.  In none of the six cases assigned to me

---

[5] *See* Civ. No. 22-739, D.I. 16; Civ. No. 22-740, D.I. 12; Civ. No. 22-742, D.I. 9; *Wireless Discovery LLC v. Coffee Meets Bagel, Inc.*, Civ. No. 22-478, D.I. 23; *Wireless Discovery LLC v. Down App, Inc.*, Civ. No. 22-479, D.I. 24; *Wireless Discovery LLC v. Eharmony, Inc.*, Civ. No. 22-480, D.I. 27; *Wireless Discovery LLC v. Grindr, Inc.*, Civ. No. 22-481, D.I. 26; *Wireless Discovery LLC v. Hily Corp.*, Civ. No. 22-482, D.I. 24; *Wireless Discovery LLC v. The Meet Grp., Inc.*, Civ. No. 22-484, D.I. 25; *Ortiz & Assocs. Consulting, LLC v. Netgear, Inc.*, Civ. No. 22-613, D.I. 10; *Safe IP LLC v. Copyleaks, Inc.*, Civ. No. 22-918, D.I. 12; *Safe IP LLC v. Grammarly, Inc.*, Civ. No. 22-919, D.I. 10; *Safe IP LLC v. Proctorio, Inc.*, Civ. No. 22-920, D.I. 9; *WFR IP LLC v. GN Audio USA Inc.*, Civ. No. 22-931, D.I. 11; *WFR IP LLC v. Skullcandy, Inc.*, Civ. No. 22-932, D.I. 14.

had the Plaintiff complied with the Disclosure Order. And in none of those cases had the Plaintiff filed a third-party funding disclosure statement.

Mr. Ramey chose not to appear at the September 1 hearing. (At a later hearing, I found that Mr. Ramey's willful disregard of the August 25 order warranted sanctions.) Mr. Chong did appear. Two issues arose at the hearing that bear on the Memorandum Order.

First, Mr. Chong admitted at the hearing that Missed Call and other LLCs that he and Mr. Ramey represented in cases assigned to me had failed to comply with the Disclosure Order. Early in the hearing Mr. Chong appeared to fault Mr. Ramey for this failure:

> THE COURT: Do you know you are not in compliance, in many of these cases with Mr. Ramey, [you] have not complied with my standing orders; do you know that?
>
> MR. CHONG: And—
>
> THE COURT: Do you know that?
>
> MR. CHONG: Yes, Your Honor. Those are some of the issues that we have been running into that there's some things that I cannot do without cooperation from Mr. Ramey's office, and that is really the most—some of the most difficult things I'm running into.

Civ. No. 22-739, D.I. 33 at 4:20–5:5.

18

But later in the hearing, Mr. Chong appeared to accept sole responsibility for

his clients' failure to comply with the Disclosure Order:

> THE COURT:  Have you asked for—I'm not asking
> who.  I'm asking these questions very intentionally.
> Have you asked for information that would enable you to
> disclose to the Court who the members of Missed Call,
> LLC are?
>
> MR. CHONG:  I have not specifically asked that to
> disclose to the Court specifically.
>
> THE COURT:  You know you are required to disclose to
> the Court, right, who the members of Missed Call, LLC
> are, right?
>
> MR. CHONG:  Yes.
>
> THE COURT:  That's not disputed, right?
>
> MR. CHONG:  Correct.
>
> THE COURT:  That's the standing order?
>
> MR. CHONG:  Correct.
>
> THE COURT:  Have you asked for that information, so
> that you can fulfill your obligation to comply with the
> standing order?
>
> MR. CHONG:  Yes.
>
> THE COURT:  So you have asked for that information?
>
> MR. CHONG:  Yes.

19

THE COURT: Presumably you've either asked Mr. Ramey or the client for that information?

MR. CHONG: Yes.

THE COURT: Okay. Have you received that information?

MR. CHONG: Yes.

\* \* \* \*

THE COURT: When did you obtain information about the membership of Missed Call, LLC?

MR. CHONG: I don't have the exact date. I've known it for some time, Your Honor.

\* \* \* \*

THE COURT: So I'm trying to figure out: Why if you know or have been told who are the members of the LLC, why you haven't complied with the Court order?

MR. CHONG: I don't have—

THE COURT: Has Mr. Ramey ever suggested to you that you should put off disclosing the identity of any members of an LLC?

MR. CHONG: No, Your Honor.

THE COURT: So if it turns out that in a number of cases with Mr. Ramey, there is a complete failure to comply with the disclosure order, that's on you; is that what you are saying?

MR. CHONG: That would be on me, Your Honor, yes. That would be.

Civ. No. 22-739, D.I. 33 at 21:13–22:16, 23:12–15, 24:3–16.

20

Second, Mr. Chong unequivocally identified Carlos Gorrichategui as the

owner of Missed Call:

> THE COURT:  . . . Describe for me Missed Call.
>
> MR. CHONG:  Describe for you?
>
> THE COURT:  Missed Call.
>
> MR. CHONG:  So I have a lot of cases, and I do admit I don't know the details offhand right now.  I know the owner.  I've spoken with him.
>
> THE COURT:  So who is the owner of Missed Call[]?
>
> MR. CHONG:  Carlos G-U-I—I don't have his— Gorrichategui.  I represented him in other cases, Your Honor.
>
> * * * *
>
> THE COURT:  And you say you're unable to effectively communicate with the client in a manner consistent with good attorney-client relations.  That client in this case is Missed Call?
>
> MR. CHONG:  Yes.
>
> THE COURT:  You don't know who the client is sounds like or do you?
>
> MR. CHONG:  Carlos.
>
> THE COURT:  Carlos is also Missed Call?
>
> MR. CHONG:  Yes.

Civ. No. 22-739, D.I. 33 at 16:11–21, 20:20–21:4.

21

V.

The day after the Missed Call hearing, September 2, Mr. Chong filed 11

amended Rule 7.1 disclosures in five different sets of related patent cases.  Four

sets of those related cases bear directly on the Memorandum Order.

First, in the three Missed Call cases, and notwithstanding Mr. Chong's

representations to the Court the day before that Missed Call was owned by Carlos

Gorrichategui, Mr. Chong filed in the 22-740 Missed Call action an amended

disclosure statement in which Missed Call represented that it was "owned 100% by

Pueblo Neuvo, LLC (Hernan Perec owns 100% of Pueblo Neuvo, LLC).O.

Gorrichategui. [sic]"  Civ. No. 22-740, D.I. 15 at 1.  Mr. Chong filed that same day

in the 22-739 and 22-742 Missed Call actions amended statements that were

identical to the 22-740 amended statement except that they deleted "O.

Gorrichategui."  Civ. No.  22-739, D.I. 19 at 1; Civ. No. 22-742, D.I. 13 at 1.  The

complaints in all three cases had been filed on June 6, 2022 and alleged

infringement of the same patent: U.S. Patent No. 9,531,872.

Second, in two related cases brought by Lamplight Licensing LLC, Mr.

Chong filed amended Rule 7.1 disclosure statements in which Lamplight

represented that "its sole owner and managing partner [sic] is Sally Pugal."

*Lamplight Licensing LLC v. ABB Inc.*, Civ. No. 22-418, D.I. 12 at 1; *Lamplight*

22

*Licensing LLC v. Ingram Micro, Inc.*, Civ. No. 22-1017, D.I. 8 at 1. Lamplight had

asserted in these two cases and in four other related cases filed by Mr. Chong

beginning in November 2021 the same patent: U.S. Patent No. 9,716,393. The

four other cases were voluntarily dismissed before September 2.[6]

Third, in two cases brought by Mellaconic IP, LLC, Mr. Chong filed

amended disclosure statements in which Mellaconic represented that "its sole

owner and managing partner [sic] is Hau Bui." *Mellaconic IP LLC v. TimeClock*

*Plus, LLC*, Civ. No. 22-244, D.I. 14 at 1; *Mellaconic IP LLC v. Deputy, Inc.*, Civ.

No. 22-541, D.I. 8 at 1. Mellaconic had asserted in these cases and in 17 related

cases filed by Mr. Chong beginning in September 2020 the same patent: U.S.

Patent No. 9,986,435. The 17 other cases were voluntarily dismissed before

September 2.[7]

---

[6] *See Lamplight Licensing, LLC v. CyberPower Sys., Inc.*, Civ. No. 21-1689, D.I. 14; *Lamplight Licensing LLC v. Vertiv Holdings Co.*, Civ. No. 21-1690, D.I. 9; *Lamplight Licensing, LLC v. Legrand AV, Inc.*, Civ. No. 21-1691, D.I. 13; *Lamplight Licensing LLC v. Panduit Corp.*, Civ. No. 22-417, D.I. 13.
[7] *See Mellaconic IP LLC v. RideCell, Inc.*, Civ. No. 20-1323, D.I. 12; *Mellaconic IP LLC v. Frontpoint Sec. Sols., LLC*, Civ. No. 21-447, D.I. 10; *Mellaconic IP LLC v. Wyze Labs, Inc.*, Civ. No. 21-448, D.I. 9; *Mellaconic IP LLC v. Cent. Sec. Grp.-Nationwide, Inc.*, Civ. No. 21-573, D.I. 10; *Mellaconic IP LLC v Monitronics Int'l, Inc.*, Civ. No. 21-574, D.I. 9; *Mellaconic IP LLC v. Canary Connect, Inc.*, Civ. No. 21-944, D.I. 8; *Mellaconic IP LLC v. Fantasia Trading LLC*, Civ. No. 21-945, D.I. 16; *Mellaconic IP LLC v. Trane Techs. Co. LLC*, Civ. No. 21-1080, D.I. 11; *Mellaconic IP LLC v. Linxup, LLC*, Civ. No. 21-1081, D.I. 10; *Mellaconic IP LLC*

Fourth, in two cases brought by Backertop Licensing, LLC, Mr. Chong filed

amended disclosure statements in which Backertop represented that "its sole owner

and managing partner [sic] is Lori LaPray." *Backertop Licensing LLC v. Canary*

*Connect, Inc.*, Civ. No. 22-572, D.I. 16 at 1; *Backertop Licensing LLC v. August*

*Home, Inc.*, Civ. No. 22-573, D.I. 19 at 1. Mr. Chong had filed a total of four

cases for Backertop beginning in April 2022. Backertop asserted in all four actions

the same three patents: U.S. Patent No. 9,332,385, U.S. Patent No. 9,654,617, and

U.S. Patent No. 10,728,382. In three of the actions, it also asserted U.S. Patent No.

10,477,011. Backertop had voluntarily dismissed in August 2022 the other two

cases.[8, 9]

---

v. *Ezlo Innovation Ltd.*, Civ. No. 21-1373, D.I. 9; *Mellaconic IP LLC v. Verkada,
Inc.*, Civ. No. 21-1374, D.I. 9; *Mellaconic IP LLC v. Incognia US Inc.*, Civ. No.
21-1844, D.I. 10; *Mellaconic IP LLC v. Carrier Glob. Corp.*, Civ. No. 21-1853,
D.I. 12; *Mellaconic IP LLC v. Connecteam, Inc.*, Civ. No. 22-242, D.I. 12;
*Mellaconic IP LLC v. PrismHR, Inc.*, Civ. No. 22-243, D.I. 9; *Mellaconic IP LLC
v. Avast Software, Inc.*, Civ. No. 22-540, D.I. 10; *Mellaconic IP LLC v. Justworks,
Inc.*, Civ. No. 22-542, D.I. 12.

[8] *See Backertop Licensing LLC v. Wyze Labs, Inc.*, No. 22-570, D.I. 10; *Backertop
Licensing LLC v. Hampton Prods. Int'l Corp.*, No. 22-574, D.I. 13.

[9] The fifth set of cases were brought by Creekview IP, LLC. Mr. Chong filed
amended disclosure statements in which Creekview represented that "its sole
owner and managing partner [sic] is Jacob LaPray." *Creekview IP LLC v. Jabra
Corp.*, Civ. No. 22-426, D.I. 14 at 1; *Creekview IP LLC v. Skullcandy Inc.*, Civ.
No. 22-427, D.I. 16 at 1. Creekview had asserted in these two cases and in four
other related cases filed by Mr. Chong beginning in November 2021 the same
single patent: U.S. Patent No. 9,608,472. The four other cases were voluntarily

VI.

By this time, even putting aside Mr. Ramey's failure to appear at the September 1 hearing, I had numerous concerns with respect to the cases being handled by Messrs. Chong and Ramey.  It was undisputed that five of their clients had failed to comply with the Disclosure Order in 11 cases, and Mr. Chong had not offered at the September 1 hearing a satisfactory explanation for these failures.  On the contrary, Mr. Chong had given conflicting statements during the hearing about whether Mr. Ramey played a role in their clients' failures to comply with the Disclosure Order.  I was also troubled by the fact that Mr. Chong's unequivocal representation during the hearing that Carlos Gorrichategui owned Missed Call was at odds with the September 2 amended disclosure in which Missed Call represented that its sole owner was Hernan Perec.

There was also reason to believe that Mr. Chong's cases shared with the Nimitz cases more than simply the fact that the plaintiffs in all these cases had failed to comply with the Disclosure Order.  The amended disclosures filed by Mr. Chong on September 2 identified Sally Pugal as Lamplight's sole owner and Lori

---

dismissed before September 2.  *See Creekview IP LLC v. Corsair Gaming, Inc.*, Civ. No. 21-1685, D.I. 8; *Creekview IP LLC v. Belkin Int'l, Inc.*, Civ. No. 21-1686, D.I. 15; *Creekview IP LLC v. Best Buy Co., Inc.*, Civ. No. 22-425, D.I. 20; *Creekview IP LLC v. Zound Indus. USA Inc.*, Civ. No. 22-428, D.I. 12.

LaPray as Backertop's sole owner. Nimitz's amended disclosure filed in response
to the May 13 show cause order identified Mark Hall as its sole owner. As noted
above, the RPX article filed in support of Amazon's objection to Longbeam's
amended disclosure statement identified Ms. Pugal, Ms. LaPray, and Mr. Hall each
as managing members of different LLCs that had been formed and then assigned
IP Edge-related patents just before bringing a series of lawsuits alleging
infringement of those patents. Longbeam had not disputed these allegations; nor
had it denied that it was an IP Edge-related entity. IP Edge is a well-known patent
monetization firm, but neither Nimitz nor Mr. Chong's clients had disclosed a
third-party funding arrangement with IP Edge.

My law clerk's review of the PTO's patent assignment database also
appeared to confirm that Mr. Pazuniak's Nimitz cases and Mr. Chong's Mellaconic
cases were connected with each other and with IP Edge. Nimitz filed with the
PTO on August 26, 2021—four days before it filed the first of its 11 cases in this
Court—an assignment of the #328 patent. The assignment, dated August 20, 2021,
identifies the assignor of the patent as Burley Licensing LLC and the assignee as
Nimitz. The assignment identifies Hau Bui as the managing member of Burley
and Mark Hall as the managing member of Nimitz. Hall is also identified as the
"submitter" of the assignment to the PTO, and the email address provided to the

26

PTO for Hall is linhd@ip-edge.com—the same email address given for Sharon
Bullion in the assignment of the patents Longbeam asserted against Amazon.

Based on the totality of this information, I was concerned that Nimitz and
the LLC plaintiffs represented by Mr. Chong may not have complied with the
Third-Party Funding Order, as none of those parties had disclosed a funding
arrangement with IP Edge.  Accordingly, on September 12 and 13, 2022, I issued
orders in these cases convening a series of evidentiary hearings "to determine
whether [each] Plaintiff has complied with the Court's standing order regarding
third-party litigation funding."  Civ. No. 21-1247, D.I. 24 at 2; Civ. No. 21-1362,
D.I. 18 at 2; Civ. No. 21-1855, D.I. 19 at 2; Civ. No. 22-413, D.I. 16 at 2; Civ. No.
22-418, D.I. 13 at 2; Civ No. 22-1017, D.I. 9 at 2; Civ. No. 22-244, D.I. 16 at 2;
Civ. No. 22-541, D.I. 10 at 2; Civ. No. 22-572, D.I. 18 at 2; Civ. No. 22-573,
D.I. 21 at 2; Civ. No. 22-426, D.I. 15 at 2; Civ. No. 22-427, D.I. 19 at 2.  For each
hearing, I directed the owner of the plaintiff LLC to be present.  And because
Messrs. Bui and Hall were identified as the managing members respectively of the
assignor and the assignee in the #328 patent assignment filed with the PTO, I
scheduled a single hearing on November 4 for the Nimitz and Mellaconic cases.

VII.

On October 12, 2022, Mr. Chong asked me to include the Lamplight cases at

the November 4 Nimitz/Mellaconic hearing to accommodate the work schedule of

Lamplight's owner, Sally Pugal.  Civ. No. 22-418, D.I. 17; Civ. No. 22-1017,

D.I. 13.  I agreed to that request.  Civ. No. 22-418, October 17, 2022 Oral Order;

Civ. No. 22-1017, October 17, 2022 Oral Order.

On October 31, Mr. Chong filed a letter in which he stated:

> An in-person Evidentiary Hearing for the above
> cases is scheduled for this Friday, November 4, 2022,
> which was moved from November 10, 2022 expressly to
> accommodate Sally Pugal, the owner of Lamplight.  On
> October 21, 2022, I was first advised by Ms. Pugal's
> representative that she has a health-related issue which
> now may prevent her from attending the hearing with the
> Court here in Delaware.  I do not have more detailed
> information about the nature of her medical issue.  Every
> day since October 24, including over the weekends, I
> have attempted to contact Ms. Pugal multiple times by e-
> mail and telephone without success.
>
> Although Ms. Pugal's flight reservation and hotel
> accommodations remain in place, as of this moment, I am
> not certain whether Ms. Pugal actually will travel to
> Delaware or appear for the hearing.  In all prior
> communications that my staff and I had with Ms. Pugal
> she made every indication that she would travel to
> Delaware and would appear before the Court on
> November 4, 2022.
>
> I wanted to bring this issue to the Court's attention
> and I will provide the Court with any updates promptly.

I am available to confer with your Honor should the
Court need any additional information prior to the
hearing.

Civ. No. 22-418, D.I. 20 at 1–2; Civ. No. 22-1017, D.I. 14 at 1–2.

Late in the afternoon of November 3, Mr. Chong filed a letter requesting a

continuance of the November 4 hearing because of Ms. Pugal's health issues.  Civ.

No. 22-418, D.I. 22; Civ. No. 22-1017, D.I. 15.

## VIII.

Ms. Pugal did not appear at the November 4 hearing.  At the outset of the

hearing, I questioned Mr. Chong about his statement in his October 31 letter that

he "was first advised by Ms. Pugal's representative that she has a health-related

issue which now may prevent her from attending the hearing":

> THE COURT:  Who was [Ms. Pugal's] representative?
>
> MR. CHONG:  . . . So Ms. Pugal['s] . . . representative is
> a company called Mavexar, who handles—who I have
> been working with, that handles a lot of, you know, is—
> basically, speaks on her behalf as her representative.
> * * * *
> THE COURT:  Okay.    So what is Mavexar?
>
> MR. CHONG:  My understanding, Mavexar is the—M-
> A-V-E-X-A-R—is the consulting company that Ms.
> Pugal has retained in regards to Lamplight.
>
> THE COURT:  Okay.   Now, your understanding is that
> Ms. Pugal retained this consulting company.    How do
> you have that understanding?

29

MR. CHONG: I've been working with Mavexar in—
with the Lamplight patents. So when I contact
Lamplight, I contact Mavexar . . . .

* * * *

THE COURT: Had you ever spoken with [Ms. Pugal]
before you filed these cases?

MR. CHONG: I did not speak with her before I filed
these cases. Mavexar had reached out to me on her
behalf. And we had communicated through Mavexar,
and had our fee agreement, and so forth, signed as
Mavexar was acting as a representative of Ms. Pugal.

THE COURT: So you are representing an entity that's
exclusively owned by somebody, and you signed a
retention letter with whom? With Lamplight?

MR. CHONG: Yes.

THE COURT: And you had never met the owner of
Lamplight when you signed the retention letter, is what
you're telling me?

MR. CHONG: That is correct.

THE COURT: And, in fact, it sounds like you never had
any discussions with the owner of Lamplight when you
signed the retention letter with Lamplight.

MR. CHONG: I did not speak with her directly. I spoke
with the representatives.

THE COURT: Her representative who's not an
employee of Lamplight. This is a consulting firm, a
separate entity; is that right?

30

MR. CHONG:  That is correct.

THE COURT:  Okay.  It's Mavexar.

MR. CHONG:  That is correct.

THE COURT:  All right.  *Do you know what the rules of ethics are about having a relationship with a client that is initiated by a third party?*

*I'm trying to think of any other context, so help me out.  I'm just trying to think what rules would be applicable.  I'm not judging.  I'm asking questions here.*

*But I'm trying to understand how you end up in an attorney-client relationship with an LLC that is exclusively owned by an individual that you have never met and you've had no conversations with an employee of the LLC, and yet you end up in an attorney-client relationship with the LLC.*

*Do you know what rules would be implicated by that?*

MR.  CHONG:  So Your Honor, I have to stop and think.

THE COURT:  How did you run conflicts?  I mean, I'm just trying to think how you would run conflicts when you're dealing with a third party that's negotiating with you to set up an attorney-client relationship with somebody else, another entity.

I'm trying to figure out how you run conflicts.  Did you run conflicts?

MR. CHONG:  Yes, Your Honor.

THE COURT:  And it's all based on representations from a third party, not from the client, correct?

MR. CHONG:  That is correct, Your Honor.

31

THE COURT:  All right.

                      * * * *

THE COURT:  Do you have your retention letter?

MR. CHONG:  Yes, I do, Your Honor.

D.I. 26 at 6:21–7:1, 7:6–15, 10:3–12:7, 18:24–25 (emphasis added).

At this point, at my request and without objection Mr. Chong handed up a copy of his firm's retention letter with Lamplight.  The letter is signed by Mr. Chong on behalf of his firm and by Sally Pugal on behalf of Lamplight.  A cursory review of the retention letter at the hearing raised troubling questions.  For example, paragraph 24 of the retention letter reads as follows:

> CLIENT ACKNOWLEDGES THAT IT WAS
> ADVISED TO RETAIN INDEPENDENT LEGAL
> COUNSEL TO REPRESENT CLIENT IN
> CONNECTION WITH THE NEGOTIATION AND
> EXECUTION OF THIS AGREEMENT, AND WITH
> RESPECT TO THE ARBITRATION CLAUSE
> ABOVE.  CLIENT FURTHER ACKNOWLEDGES
> THAT IT WAS ADVISED THAT FIRM HAS A
> CONFLICT OF INTEREST THAT PREVENTS IT
> FROM REPRESENTING CLIENT IN ANY WAY
> WITH RESPECT TO THE NEGOTIATION AND
> EXECUTION OF THIS AGREEMENT AND THAT
> FIRM HAS NOT DONE SO.

Nov. 4, 2022 Hr'g, Ex. 1 at 7 (capitalization in the original).  I asked Mr. Chong specifically about this paragraph:

THE COURT: Since you never spoke with her, how did you advise Lamplight Licensing, which is the client, the only member of which is Ms. Pugal?

How did you actually advise Lamplight, LLC, to retain independent legal counsel to represent it in connection with the negotiation and execution of your retainer agreement?

MR. CHONG: *That was advised through its representatives. So Mavexar was speaking on behalf of Ms. Pugal and handled the discussions.* So I had discussed—I had everything—*every discussion I've had was with Mavexar as if it was Lamplight.*

D.I. 26 at 20:14–25 (emphasis added).

Mr. Chong also revealed at the hearing that he did not know the financial terms of Mavexar's relationship with Lamplight. *See* D.I. 26 at 29:14–17 ("THE COURT: Do you know what the financial terms of Mavexar's relationship with Lamplight are? MR. CHONG: I don't. That's something that they have worked out themselves.").

At the conclusion of my colloquy with Mr. Chong, I stated that I was "not able to make any more definitive judgments about the accuracy of the third-party funding statements, which is what gave rise to this hearing[,] . . . without hearing directly from" Ms. Pugal, D.I. 26 at 37:8–12; and I asked Mr. Chong to provide within 30 days a status report of Ms. Pugal's health and ability to participate in a hearing, D.I. 26 at 39:9–16.

33

At this point, although I had convened the hearing to determine if Lamplight, Nimitz, and Mellaconic had complied with the Third-Party Funding Order, I was now as concerned, if not more concerned, about whether Mr. Chong had acted consistent with the Rules of Professional Conduct and whether Mavexar—an entity I had never heard of—was the real party in interest in Lamplight's cases.

<h2 style="text-align:center">IX.</h2>

I next turned to the Nimitz cases and invited Mr. Pazuniak to the podium. This discussion ensued:

> MR. PAZUNIAK:  Similar to Mr. Chong . . . *I was contacted by what I understood to be an agent for Nimitz Technologies.*
>
> THE COURT:  A nonlawyer agent, right?
>
> MR. PAZUNIAK:  *It's not a lawyer.  It's a lady by the name of Linh Dietz*, L-I-N-H D-I-T-Z.
>              * * * *
>    . . . *[S]he was representing Nimitz Technologies. And she had provided the basic information.*
>      Thereafter, I did my own investigation, in the sense of double-checking the patent, double-checking the Nimitz Technology.  For example, I did go to the Texas Secretary of State's [w]ebsite to gain the information about Nimitz Technology, and that's what I put down into the complaint.
>      Similar, I went to the Delaware Secretary of State's office to obtain information on the defendants,

34

and making sure that the correct entities were named, correct spellings and correct addresses.

The complaint was entirely drafted by me.

Prior to that, we, of course, had the retainer agreement. *Th[e] retainer agreement, again, I drafted. And it was forwarded to Linh Dietz, to forward to Mark Hall as the princip[al] of Nimitz Technologies.*

I knew that he was the princip[al] because of the— I had double-checked the Secretary of State's office before I prepared the retainer letter.

THE COURT:  Okay.

MR. PAZUNIAK:  And—

THE COURT:  So you knew he was the princip[al] based on the Secretary of State's disclosure—

MR. PAZUNIAK:  And—

THE COURT:  —he was the princip[al] of Nimitz?

MR. PAZUNIAK:  He is—Mr. Hall is the—I think that—I want to make sure I have the phrase right.  He's the managing member of the entity.  *And it was confirmed by Ms. Dietz that he was the sole, 100 percent, owner of the entity.*

THE COURT:  Okay.

MR. PAZUNIAK:  When Your Honor's order came out, again, I did the investigation.

With respect to the funding in this litigation, I knew pretty much what the funding was, because the only funding that had been provided had been by myself, or my firm.

35

THE COURT: Well, actually, can I stop you there? How did you know that? I mean, you obviously know whether you're providing funding or not.

MR. PAZUNIAK: Yeah.

THE COURT: How do you know there isn't some third party out there that's providing funding?

MR. PAZUNIAK: Well, again—yes, I was getting to that.

THE COURT: Oh, okay. So I thought you just said that you knew that, since you were the only funder.

MR. PAZUNIAK: I should say that I knew that, what funding had been required, you know, for the filing of the—and maintaining of the lawsuits, and that had been provided by my firm as an advance. And we, of course, have a retainer agreement that required Nimitz Technology to be responsible for all costs.

D.I. 26 at 41:24–44:13 (emphasis added).

Mr. Pazuniak then appeared to suggest that Linh Dietz was somehow connected to Mavexar, the entity whose existence I had just learned of from Mr. Chong:

MR. PAZUNIAK: Once Your Honor's question was brought up, I did consult with Ms. Dietz. She provided, to me, the agreement between Mavexar and the Nimitz Technology, which I double-checked and confirmed that any funds advanced by Mavexar are—would be the responsibility of Nimitz Technology. Which, of course, at that point, was kind of moot because, to my knowledge

36

in the litigation, no other funds had been expended, other than those that I—my firm had incurred.

\* \* \* \*

. . . I did go and check and there was no nonrecourse funding of any sort provided to Nimitz Technology, period.

And this was—and, again, I'm trying to be very careful because we have attorney-client relationship issues. And—

THE COURT: Yeah. *I don't know how you have attorney-client relationship issues if you're dealing with the client through a nonlawyer third party. That, right away, I mean—and I'm willing to hear you. But that doesn't sound right to me.*

*Either you have that or, then, I think you have unauthorized practice of law issues that are arising perhaps in other states.*

MR. PAZUNIAK: Well, Your Honor, but there is communications between me and Mr. Hall, i.e. Nimitz.

THE COURT: I hear you. I get that.

MR. PAZUNIAK: And that's why I'm trying to be careful.

THE COURT: Okay.

MR. PAZUNIAK: When I say "confirmed," obviously, I did my due diligence in accordance with Rule 11 in making the representations. And—so I'm trying to be careful not to inadvertently, you know, create doubt on my ability to invoke the privilege.

THE COURT: Sure. Okay. And that's fair. That's a good thing to be concerned about.

D.I. 26 at 44:14–22, 46:8–47:9 (emphasis added).

Based on these representations from Mr. Pazuniak, I was concerned that, like Mr. Chong, Mr. Pazuniak may not have acted consistent with the Rules of Professional Conduct. Although Mr. Pazuniak stated, "[T]here is communications between me and Mr. Hall, i.e. Nimitz," his comments overall indicated that he communicated with Nimitz exclusively through Linh Dietz, whom Mr. Pazuniak had said was not a lawyer. D.I. 26 at 41:24–42:4, 46:22–23. That made me question, for example, how Mr. Pazuniak could fulfill his ethical obligation under Rule 1.4(b) to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"; and how could he be confident that he had satisfied his professional obligations under Rule 1.2, which provides that "a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued"? MODEL RULES OF PRO. CONDUCT r. 1.4(b), 1.2 (AM. BAR ASS'N 2022).

Mr. Pazuniak's description of his dealings with Linh Dietz also raised questions about Mavexar's role in these cases. Was Mavexar, as opposed to Nimitz, the real client whose interests were being served by Mr. Pazuniak's firm? Finally, the question of IP Edge's role in these cases—the question that gave rise to

my concern that Nimitz had not complied with the Third-Party Funding Order—
remained.  Linh Dietz seemed a logical candidate for the linhd@ip-edge.com email
address used by Nimitz and Longbeam with the PTO.

For these reasons, I told Mr. Pazuniak that "I'd like to have Mr. Hall take the
stand."  D.I. 26 at 49.  Mr. Pazuniak replied, "Sure.  Of course."  D.I. 26 at 49:12–
13.  I made very clear the scope of my intended questioning of Mr. Hall; I stated:
"I'd like to know about how he came to come in possession of this patent and
Nimitz and its financial relationships."  D.I. 26 at 49:17–19.  This discussion
followed:

> MR. PAZUNIAK:  That's—Your Honor, the only
> request I would make is that the information be provided
> in a closed courtroom.  This is information that is private.
> It's business related.  It's—if we get in other situations,
> this kind of information would be subject to a protective
> order.
>
> * * * *
>
> . . . I'm not asking the Court to be precluded from
> pursuing its intended line of inquiry. . . .
> . . . And I just want to make sure that, as we go
> forward, we're not waiving any rights.  And therefore, I
> do formally request that because the questions and
> answers may involve matters of personal privacy and
> business arrangements that are not public, and have
> always been intended to be kept confidential, that the
> information be heard in a closed courtroom.
>
> THE COURT:  All right.  So I think the way we'll
> address that is, let's take it on a question-by-question
> basis.

39

MR. PAZUNIAK:  Okay.

THE COURT:  And, you know, you can make an objection or ask, if I put to the witness a certain question, you can stand up and say you think this implicates some kind of interest that would be sufficient under Third Circuit law.

Which you should make sure you've read Third Circuit law.  It is very, very hard to keep something under seal in the Third Circuit, and it's the Third Circuit that governs.

D.I. 26 at 49:20–25, 50:12–13, 50:18–51:12.

After a short break, Mr. Hall took the stand.  I asked him some general background questions and then turned to the subject of Nimitz:

Q.  Well, what does Nimitz do?

A.  Nimitz monetizes patents.

Q.  What does that mean, to "monetize[ ] patents"?

A.  Make money off of existing patents.

Q.  How many patents does Nimitz own?

A.  I don't know offhand.  I'd have to look back at the paperwork.

\* \* \* \*

Q.  Nimitz owns the patent that's been asserted in these cases; is that right?

A.  Correct.

\* \* \* \*

Q.  How did you come to acquire the [#]328 patent?

40

A.  I was presented an opportunity.

Q.  By whom?

A.  Mavexar.

Q.  Who is Mavexar?

A.  As an entity?  I'm not sure what you mean.

Q.  Well, you're the one who used the phrase.  So what did you mean when you said you were presented an opportunity by Mavexar.  I'm just following up on your question, sir.

A.  Okay.  Consulting agency.

\* \* \* \*

Q.  Consulting agency that does what?

A.  My understanding is they look for patents.

Q.  How did you first learn of Mavexar?

A.  I was presented an opportunity by Mavexar and we discussed what they did, and what the opportunity would entail.

Q.  Where did that presentation of the opportunity occur?

A.  Over the phone.

Q.  Whom did you speak with?

A.  Linh Dietz.

\* \* \* \*

Q.  How did you pay for the [#328] patent?

41

A. There was an agreement between Mavexar and myself where I would assume liability.

Q. What does that mean?

A. No money exchanged hands from my end.

Q. You have to—I'm not a financial guy, so you have to explain it to me.

So you own the patent, but no money—you didn't exchange any money for it?

A. No.

Q. So is that what you're saying?

A. Yes.

Q. *So how do you come to own something if you never paid for it with money?*

A. *I wouldn't be able to explain it very well. That would be a better question for Mavexar.*

Q. Well, you're the owner?

A. Correct.

Q. *How do you know you're the owner if you didn't pay anything for the patent?*

A. *Because I have the paperwork that says I'm the owner.*

\* \* \* \*

Q. Now, you said that you would assume liability for the patent, is that right, when you took ownership of it?

A. Correct.

42

Q.  What does that mean?

A.  Liability in case of—any monetary liability from a case that did not proceed well.

Q.  So is it your understanding, then, if, in this case, for instance, the Court assigned—or awarded attorney fees to the other side, that you personally would have to pay for them; is that right?

A.  I believe that's true, yes.

Q.  Do you have the documents with you today—

A.  I do not.

Q.  —that reflect your assumption of ownership of the [#]328 patent?

A.  I do not.

D.I. 26 at 65:14–20, 66:2–4, 67:25–68:10, 68:14–23, 69:16–70:11,

71:8–23 (emphasis added).

At this point, Mr. Pazuniak handed up copies of a "Patent Assignment

Agreement" and its "Exhibit A," which is a "Patent Assignment" that looks to be

identical to the assignment my law clerk had found on the PTO's patent

assignment database for the #328 patent.  Under the terms of the assignment,

Burley Licensing, "[f]or good and valuable consideration," "assign[ed],

transfer[red], and convey[ed]" to Nimitz . . . "all right, title, and interest that exist

43

today and may exist in the future in and to" the #328 patent.  Nov. 4, 2022 Hr'g,

Patent Assignment Agreement, Ex. A at 1.  I noted to Mr. Hall that the assignment

identified Hau Bui as the managing member of Burley and asked him if he knew

Mr. Bui.  He replied, "I do not."  D.I. 26 at 72:8–11.

> The remainder of my questioning of Mr. Hall reads in relevant part:

> Q.  So the Exhibit A to the assignment says that "For
> good and valuable consideration, the receipt of which is
> hereby acknowledged, the patent is transferred to you."
> What was the good and valuable consideration you
> received?

> A.  I'm not sure what you mean there.

> Q.  Or I should say, rather, what is the good and valuable
> consideration you paid for the patent?

> MR. PAZUNIAK:  Objection.

> BY THE COURT:
> Q.  Do you understand what good and valuable
> consideration is?

> A.  I believe I understand what you're asking.  And the—

> Q.  Well, put it in your own words.  What do you think
> that means?  What does "consideration" mean?

> A.  I would think—I think you mean some kind of
> payment.

> Q.  Right.  And so what did you pay them that persuaded
> somebody to give you the patent?

A.  My understanding of what it is, it's a business opportunity presented to me from Mavexar, similar to when I retained a management company for my rental properties.  I don't know the renters.  I don't deal with the renters.  They do.  That's the agreement that we have.  If there's proceeds to be made, there's an agreement between us as to what we split.  If there's losses incurred, it's my property, I pay for the losses, similar to this.

Q.  Okay.  And how much, then—well, then, is it your understanding that the revenue, the money that will be made from the patent, will be obtained through litigation of the patent; is that fair?

A.  Yes.

Q.  What percentage of the litigation do you recover for assuming all this liability?

A.  I believe it's 10 percent.

Q.  So you're the owner of the patent, but you only get one-tenth of it?

A.  Correct.

Q.  *Well, did anyone explain to you why Mavexar wanted you to assume liability for the patent?*

A.  *No one explained it, no.*

Q.  *Do you have an understanding as to why you're assuming liability for the patent if you only would share—or obtain 10 percent of the proceeds from it?*

A.  *No.* I viewed it as an investment, just like stocks.

45

Q. *Were you involved in the litigation decisions in the cases that are filed that assert the patent?*

A. *No.*

Q. *And is it your understanding that all the litigation decisions are made by the lawyers and Mavexar?*

A. *Correct.*

\* \* \* \*

Q. Have you ever heard of IP Edge?

A. I have.

Q. What do you know about it?

A. Not much.

Q. Have you ever had any interactions with IP Edge?

A. Other than Linh Ditz's e-mail address, no.

Q. And that's the only knowledge you have of IP Edge, is the fact that she has an IP Edge e-mail address; is that right?

A. Correct. Correct.

\* \* \* \*

Q. *And you mentioned you didn't have any involvement in the litigation decisions. So do you have prior knowledge of the filing of complaints?*

A. *No.*

Q. *Do you have any prior knowledge of any settlements reached in litigation filed—*

A. *No.*

46

Q.  —to assert the patent—let me—

A.  Sorry.

Q.  I'm sorry.  That's all right.  *Do you have any prior knowledge of settlements that are reached in litigation in which Nimitz patents are asserted?*

A.  *No.*

Q.  *So you're just told after the fact?*

A.  *Correct.*

Q.  So from your perspective, this is purely an investment opportunity, fair?

A.  Fair.

Q.  *And although you are in name the owner of the patent, you defer solely to Mavexar and the lawyers to make all the decisions associated with how the patent is asserted and how cases are settled, fair?*

A.  *Correct.*

Q.  And that's really the motivation for you as an investor, fair?

A.  Correct.

\* \* \* \*

Q.  Has Nimitz received any money from settlements relating to its patents?

A.  Yes.

Q.  Approximately how much?

47

A. $4,000.

Q. In total?

A. (Witness nods head.)

D.I. 26 at 72:25–75:2, 75:18–76:2, 76:13–77:14, 82:19–25 (emphasis added).

By the time Mr. Hall's testimony concluded, my concerns about whether Mr. Pazuniak had acted consistent with the Rules of Professional Conduct had only grown. Mr. Pazuniak was the only lawyer representing Nimitz in these cases; Mr. Hall was the only owner and the only identified member of Nimitz. And yet Mr. Pazuniak had apparently had no communications with Mr. Hall before the cases were filed and had had no communications with Mr. Hall about settling the seven Nimitz cases Mr. Pazuniak had moved to voluntarily dismiss between December 14, 2021 and April 27, 2022. *See* Civ. No. 21-1246, D.I. 10; Civ. No. 21-1364, D.I. 8; Civ. No. 21-1249, D.I. 11; Civ. No. 21-1248, D.I. 10; Civ. No. 21-1360, D.I. 10; Civ. No. 21-1856, D.I. 9; Civ. No. 21-1363, D.I. 15. Under Model Rule 1.2, the "decision[ ] . . . whether to settle a civil matter, must . . . be made by the client." MODEL RULES OF PRO. CONDUCT r. 1.2 cmt. (AM. BAR ASS'N 2022). But according to Mr. Hall, Mavexar and lawyers selected by Mavexar made all the decisions associated with how the #328 patent was asserted and how cases were settled. Mr. Hall learned of settlements only "after the fact." D.I. 26 at 77:2–3.

48

It also appeared from Mr. Hall's testimony that Mavexar, not Nimitz, controlled the #328 patent, and that Nimitz did not in fact possess "all right, title, and interest" to the #328 patent as had been represented in the assignment filed with the PTO. No doubt the assignment identified Nimitz as the assignee of the patent. But the assignment was filed by someone using what appeared to be Linh Dietz's IP-Edge email account; Linh Dietz acted on behalf of Mavexar in arranging for Mr. Hall to authorize Nimitz to appear as the assignee on the assignment; Mr. Hall said Nimitz had paid nothing for the assignment of the patent; the named assignor of the patent was not known by Mr. Hall but was connected to IP Edge and apparently to Linh Dietz; Nimitz received only 10% of any revenue generated by the patent; and Nimitz played no role in the decisions associated with asserting the #328 patent in and settling lawsuits. These facts suggested that the assignment of the #328 patent could very well be a fiction, and that frauds may have been perpetrated on the PTO and this Court.

I thought those possibilities seemed even more likely after hearing the testimony of the next witness, Hau Bui.

## X.

Hau Bui's story was similar in important ways to Mark Hall's. The owner and operator of a food truck and of what he described as a "fried chicken joint,"

49

Mr. Bui agreed to become the sole owner of Mellaconic to take advantage of "an opportunity" offered to him by the seemingly ubiquitous Linh Dietz.  D.I. 26 at 86:1–2, 87:2–12.  As far as Mr. Bui knew, Mavexar formed Mellaconic for him in 2020.  D.I. 26 at 90:9–11.  Like Mr. Hall, who said he "wouldn't be able to explain [Nimitz's acquisition of its patent without an upfront payment] very well" and that my inquiry on the subject "would be a better question for Mavexar," Mr. Bui struggled to explain how and why Mellaconic was able to obtain patents without paying for them.  And like Mr. Hall, Mr. Bui essentially acknowledged that he rubber stamped "approvals" of Mavexar's decisions to file and settle lawsuits asserting patents putatively titled in Mellaconic's name.

After asking Mr. Bui briefly about his background, I turned to the subject of Mellaconic:

> Q.  What does Mellaconic do?
>
> A.  Yeah.  Mellaconic owns patents, the rights to patents.
>
> Q.  All right.  How many patents?
>
> A.  I believe six.
>
> Q.  And what types of patents?
>
> A.  I haven't really looked over them.
>
> Q.  Okay.  How much did you pay for the patents?

A.  I didn't pay for the patents.

Q.  So how do you come to own patents if you don't pay for them?

A.  I was—came up—someone pushed me with the opportunity, selling the patents.

Q.  Who was that?  Mellaconic?

A.  Mellaconic—no, Mavexar.  Sorry.

Q.  Mavexar.  Well, how did you come in touch with Mavexar?

A.  Linh.

Q.  Is this Linh Dietz?

A.  Linh Dietz.

Q.  How do you know her?

A.  She's a friend.

Q.  When did she first approach you about this idea of assuming ownership of patents?

A.  I believe in 2020, right when the pandemic hit.

Q.  And what did she tell you?

A.  She just came up to me and just told me if I would like an opportunity to deal with patents and make passive income.

* * * *

Q.  So . . . make a passive income.  What does that mean?

51

A.  Like, income.  Coming in without, you know—I don't know how to describe it.  Just like, kind of like—

Q.  How about this?  You don't have to do anything; is that fair?

A.  Yeah, you don't have to do much, yeah.

Q.  Well, what do you have to do?

A.  As far as?

Q.  As far as getting ownership of patents.  I assume the patents are worth something, in your mind?
        Do you think the patents are worth anything?

A.  Yes.

Q. All right.  Do you have any sense of how much they're worth?

A.  I'm not an expert in patents.  I wouldn't know.

Q.  Well, did Ms. Dietz or anyone else, when you took ownership of the patents, give you any sense of what they thought the patents were worth?

A.  No.

Q.  Did you have to give up anything in order to assume ownership of the patents?

A.  No, sir.

Q.  Did you have to take on any responsibilities to assume ownership of the patents?

A.  As far as, just like, viewing the litigations and everything that come through.

Q.  Oh, so you do review the litigations?

A.  Yeah.

Q.  Tell me about what you do in that regard?

A.  So Mavexar will send me the litigations of what's going on or the, you know, attorney engagements.  And then I, essentially, if I sign—I approve of them or disapprove of them.

Q.  How do you know whether to approve or disapprove of an attorney?

A.  I mean, I chose Mavexar and they're—they're—what is it?—they're good.  Like, you know, they haven't done me wrong.

D.I. 26 at 86:18–87:21, 88:2–89:14.

I then turned to how Mellaconic and Mr. Bui were compensated for efforts

to monetize the patents assigned to Mellaconic:

Q.  Well, so do you get a share, then, of lawsuits or settlements that are brought using these six patents?
     Is that how you make money, passive income, as you call it?

A.  Yeah.

Q.  About how much income have you made so far?

A.  Year to date?

Q.  Well, when did Mellaconic buy its first—or not buy—when did it assume ownership of its first patent, if you remember?

A.  I can't remember off the top of my head.

Q.  Was it last year or the year before?

A.  I know it was formed in 2020, so...

Q.  What's Mellaconic mean, as a name?

A.  It's just a name.

Q.  I mean, whose idea was the name?

A.  I don't know.

Q.  You don't know?

A.  I don't know.

Q.  Were you, basically, just provided the paperwork to form the LLC?

A.  Yes.  They formed the LLC for me.

Q.  And so did they come up with the name?

A.  Yes, sir.

Q.  Have you ever—has Mellaconic sold any patents?

A.  Sold any patents?  No.

Q.  Has it assigned any patents to anybody else?

A.  As far as license—licensing?

Q. Licensing? Okay. Has it licensed patents to other people?

A. They have licensed to, like, other companies to use them.

Q. Okay. Do you get a share of those proceeds?

A. From what the settlement—from the litigations, I do.

Q. So is it fair to say, the licensing have all occurred in connection with litigation?

A. Yes.

Q. Okay. And you get a share of that?

A. Yes.

Q. What's your share?

A. With?

Q. Of the litigation or settlements.
      What's your share? Do you get a percentage share?

A. Percentage.

Q. And what is it?

MR. WERNOW: Objection, Your Honor. Just confidential business information.

THE COURT: Go ahead.

THE WITNESS: 5 percent.

55

D.I. 26 at 89:15–91:14.

Mr. Wernow was not an attorney of record when he made this objection; nor had he ever sought to be admitted *pro hac vice* to appear as Mellaconic's counsel in the cases at issue in the November 4 hearing. Accordingly, I ignored the objection. (I would nonetheless have overruled the objection even if it had been made by counsel of record. Mr. Wernow cited and I know of no legal authority that would bar a court from requesting Mr. Bui under the circumstances presented here to disclose the percentage he received from the settlements obtained by Mavexar and the attorneys it hired putatively on Mellaconic's behalf.)

Mellaconic's counsel of record in the two Mellaconic cases involved in the November 4 hearing (the 22-244 and 22-541 actions) were Mr. Chong and Andrew Curfman. Mr. Curfman had been admitted *pro hac vice*, but he was unable to attend the November 4 hearing for health reasons. Messrs. Curfman and Wernow are partners in the law firm of Sand, Sebolt & Wernow Co., LPA. Mr. Curfman had been admitted *pro hac vice* to represent Mellaconic in 11 of the 19 related cases filed by Mellaconic. Importantly, as I will later explain, counsel had filed motions to voluntarily dismiss ten of those cases before I issued my order convening the November 4 hearing.

Having learned that Mellaconic received only 5% of the proceeds from any litigation brought in its name, I turned next to what role Mellaconic played in those litigations:

> Q. . . .  Now, before a lawsuit is brought, do you read the complaint?
>
> A.  What was that?
>
> Q.  Before a lawsuit is brought—tell me how it comes to be, the fact that a lawsuit is brought by Mellaconic? How does it work?
>
> A.  So they will meet with the documentations, and I have to review the documentations, and then I either approve it or deny it.
>
> Q.  Have you ever denied it?
>
> A.  No.
>
> Q.  Okay.  And who sends you the documentation?  Is it Mavexar?
>
> A.  Mavexar, yes.
>
> Q.  Have you ever had an attorney represent you in any of these litigations?
>
> A.  What's that?
>
> Q.  Have you ever had an attorney represent you, to your knowledge, in these litigations?
>
> A.  I mean, like, with the Mellaconic?  Yeah.

Q.  Okay.  And what attorneys have represented Mellaconic?

A.  Sand Sebolt, as far as I know.

Q.  Anybody else?

A.  I would have to go back and look.

Q.  Okay.  And that would be—would that be Mr. Curfman?

A.  What was the name again?

Q.  Andrew Curfman; is that right?

A.  Uh-huh.

Q.  You to have say it.

A.  Yes.  Sorry.

Q.  No, that's all right.  No problem.  So have you ever met Mr. Curfman?

A.  Yes, virtually.

Q.  Virtually.
When did you first meet him?

A.  Probably two months ago.

Q.  So that's after [the] lawsuits ha[d] been filed?

A.  Yes.

Q.  Have you ever had any communications with Mr. Curfman?  I don't need to know what they are.  But ha[d]

58

you ever had any communications with Mr. Curfman
before two months ago?

A. No.

Q. So how was he retained to represent Mellaconic?

A. Through Mavexar.

Q. So you didn't have any discussions with him.
Mavexar handled all the negotiations with Mr. Curfman;
is that right?

A. Yeah. On my behalf, yes.

D.I. 26 at 91:17–93:18.

I then returned to the issue of how Mellaconic acquired its patents:

Q. So I want you to try to help me understand this idea
that you can take ownership of a patent without paying
for it.
        You know, normally, when you get something of
value—you think these patents have value, don't you?

A. Yes.

Q. All right. So normally, when you get something of
value, you have to pay something for it?

A. Uh-huh.

Q. Do you agree with that?

A. Yes.

Q. So what did you have to pay to take on these patents?

59

A.  With the previous owners?

Q.  The patents that you own now.  What did you have to give up in value for you to be able to assume ownership of these patents?

A.  I didn't give nothing.

Q.  You didn't give them anything.  So were they a gift?

A.  No. It's—

Q.  So what's the—then help me. I'm just trying to understand this concept.
     If it's not a gift, you're not paying anything, why is someone giving you these patents?

A.  You would have to ask Mavexar that.

Q.  Did you take on any liability as a result of assuming ownership of the patents?

A.  What do you mean by "liability"?

Q.  Well, so you don't know?

A.  What's that?

Q.  You don't know what "liability" means?

A.  I mean, I have a general idea, but...

Q.  Was there any risk that you assumed when you assumed ownership of the patents?

A.  Oh, there's always a risk in everything.

Q.  So what's the risk?

60

A. I mean, if things fall through, then I would have to come out of pocket.

Q. And what kind of things would you have to come out of pocket, is your understanding?

A. So if, like, litigation goes wrong, Mavexar has the right to come after me for the costs of what was loaned.

* * * *

Q. Who pays for the lawyer fees to go out and sue people
using the patents owned by Mellaconic?

A. Mavexar.

Q. And what is—do they loan you the money for that?

A. Yes. It's a recourse.

Q. What do you mean by "recourse"?

A. Like a loan.

Q. Well, how did you come up with the terms "recourse"?
I'm just—what does that mean?

A. All I know is it's like a loan.

* * * *

Q. . . . Have you ever had to pay any expenses associated with any litigation for Mellaconic?

A. Have I ever paid any litigation expenses, no.

Q. Okay. And have you—again, apologize, if I asked you. But have you—has Mellaconic ever made any money from any of the patents it's owned?

61

A.  From the litigations?

Q.  Yes.

A.  Yes.

Q.  And how much, about, is that?

A.  I want to say—I don't know top of my head.
11,000, maybe.

Q.  Okay.  And then you also mentioned licensing that
came out of settlements.  Does that include—is that part
of the 11,000, or is that different?

A.  That's just with the settlement.  That's what I've
gotten.

Q.  So the total you've gotten, is it fair to say—

A.  Yes, 11,000 or so.

Q.  All right.  And is it all through settlements that were
connected with litigation?

A.  Yes.

Q.  Okay.  Do you know how much other people get?
You know what you get, right?  Do you know how the 95
percent is broken up, who gets it?

A.  I do not know the exact, who gets, you know,
percentage.

Q.  No?

> A.  Well, I know that the—like the back-end pay to the
> previous patent owners.

D.I. 26 at 93:22–95:12, 96:8–17, 98:3–99:9.

I then asked Mr. Bui about assigning patents.  Mr. Bui testified that he did

not recall ever signing documents to transfer any of Mellaconic's patents to

another entity or person.  D.I. 26 at 99:17–20.  He also testified that the name Mark

Hall "doesn't ring a bell."  D.I. 26 at 99:15.

I concluded my questioning of Mr. Bui as follows:

> Q.  Is it fair to say that your involvement in all the
> litigation was performed through Mavexar?
>
> A.  Mavexar.
>
> Q.  Mavexar.  Sorry.
>
> A.  Yes.
>
> Q.  Thank you very much [for correcting my
> pronunciation of Mavexar].
>      That would be fair?
>
> A.  Yes.
>
> Q.  And, basically, is it fair to say that you do whatever
> they advise?
>
> A.  Yes.
>
> Q.  You don't have any other knowledge to challenge any
> of their advice; is that fair?

A.  Yeah.  They've been doing it.  I don't have any knowledge to object against them.

&ast; &ast; &ast; &ast;

Q.  And you mentioned you met Mr. Curfman about two months ago remotely?

A.  Remotely, yeah.

Q.  Yeah.  I don't want to know about the conversation you had with him, the specifics, but why did you not meet him until two months ago?
What was it that prompted the meeting two months ago?

A.  This hearing.

Q.  Is it fair to say that you're aware that there was an order issued by the Court that required you to participate here?

A.  Yes.

Q.  Was that what prompted the meeting?

A.  Yes.

Q.  Okay.  And prior to that, you had -- fair to say, you had had no discussions with Mr. Curfman; is that fair?

A.  Yes.

Q.  Had you had any discussions with anybody from Mr. Curfman's law firm prior to that meeting?

A.  No.

D.I. 26 at 99:21–100:10, 101:7–102:1.

As Mr. Bui walked away from the witness stand, he was approached by Mr. Wernow. The two men engaged in a brief conversation during which Mr. Wernow appeared to show Mr. Bui some documents. D.I. 26 at 102. Mr. Wernow then turned to ask me if he could "put Mr. Bui back on the stand just to correct a statement?" D.I. 26 at 102:16–19. I told Mr. Wernow that since he was not an attorney of record, he could not do that. D.I. 26 at 102:11–13. (I had no knowledge at the time that Mr. Wernow had represented Mellaconic in some of the related cases.) Mr. Chong then handed up a motion to admit Mr. Wernow *pro hac vice*, which I reviewed and granted. D.I. 26 at 102:20–103:4. I then asked Mr. Bui to retake the stand and allowed Mr. Wernow to question him.

Mr. Wernow began by handing Mr. Bui a Patent Assignment Agreement executed by Mellaconic and Empire Technology Development LLC on August 10, 2020—the month before Mr. Chong filed the first Mellaconic case in this Court. *See* Civ. No. 20-1323, D.I. 1. Under the terms of the agreement, Empire Technology assigned to Mellaconic "all right, title, and interest" to six patents, including the #435 patent asserted by Mellaconic in its 19 cases filed by Mr. Chong. Nov. 4, 2022 Hr'g, Ex. 2 at 1. The Agreement appeared to have been signed by Mr. Bui on behalf of Mellaconic. Nov. 4, 2022 Hr'g, Ex. 2 at 11. The

email address given for Mr. Bui in the agreement is info@ip-edge.com. Nov. 4,

2022 Hr'g, Ex. 2 at 9.

Mr. Wernow then said, "I just wanted to clarify some things I heard when

you were speaking with his Honor earlier," and began to walk Mr. Bui through the

document. D.I. 26 at 103:21–104:2. I interjected and the following ensued:

> THE COURT:
> So actually, I'm going to object to leading questions. I
> mean, if you want to make attorney argument, you can
> bring the documents up, and you can show me and make
> your argument.
>     But one of the important reasons why I wanted to
> have a hearing, is to find out the reality, and find out who
> really is the beneficial owner, who's got the real interest
> in the litigation. And the best answers you get are
> from—the most truthful answer you get to things like that
> are open-ended questions. I don't want you to walk this
> witness through a legal document.
>
> MR. WERNOW: Sure.
>
> THE COURT: All right. And I can read the legal
> document.
>
> MR. WERNOW: Sure. Can we just ask—
>
> BY MR. WERNOW:
> Q. In reviewing Page 2—or Section 3, the
> considerations section of Exhibit 2, can you please tell
> the Court how Mellaconic has paid for these patents?
>
> THE COURT: I don't need that. I can read the
> document. You want to ask him open-ended questions,
> go ahead. Ask him what he remembers. Ask him what

66

> he knows.  Ask him his understanding.  Let's not have
> him go read a document.
>
> MR. WERNOW:  Sure.
>
> BY MR. WERNOW:
> Q.  What do you remember about this patent purchase
> agreement, Mr. Bui?
>
> A.  There was 50 percent take back towards the previous.
>
> Q.  For consideration?
>
> A.  For consideration of the net proceeds.

D.I. 26 at 104:3–105:8.

With this answer, Mr. Wernow ended his questioning of Mr. Bui about the

Patent Assignment Agreement and what Mellaconic paid for the six patents Mr.

Bui said it owned.  The provision in the Patent Assignment Agreement Mr.

Wernow wanted Mr. Bui to repeat in Court reads: "As consideration, [Mellaconic]

shall pay [Empire] fifty percent (50%) of the Net Proceeds received by

[Mellaconic] as a result of enforcement of the" six patents covered by the

agreement.  Nov. 4, 2022 Hr'g, Ex. 2 at 2.

The exchange between Mr. Wernow and Mr. Bui, in my mind, raised more

questions than it answered.  It certainly did not leave me confident that Mr. Bui

understood the meaning or effect of the provision; nor did it explain or give reason

to disregard Mr. Bui's earlier testimony that he "didn't give nothing" to assume

ownership of the patents titled in Mellaconic's name and that Mellaconic received

only 5% of the revenue generated from asserting in litigation the patents it

purportedly had "all right, title, and interest" in. Mr. Bui had already testified that

some portion of the 95% of the litigation proceeds that Mellaconic did not receive

went to a prior owner of the asserted patent.

Mr. Wernow then turned to a Consulting Agreement he had handed Mr. Bui.

The Consulting Agreement was executed by Mellaconic and Mavexar on August

11, 2020. Under the heading "Responsibilities," the Consulting Agreement states

that Mavexar

> shall provide non-legal services, including one or more of
> the following: (a) identify companies that potentially
> infringe on the rights covered by the patents owned by
> [Mellaconic] ("the Patents"), (b) assist [Mellaconic] in
> monetizing the Patents; (c) assist in identifying products
> and/or services covered by the Patents; (d) select and
> negotiate rates to enable retention of counsel; and (e)
> manage counsel as necessary during the course of
> litigation and licensing efforts.

Nov. 4, 2022 Hr'g, Ex. 3 at § 1. The Agreement provides that "[i]n exchange for

the services provided by [Mavexar]," Mellaconic agrees to pay Mavexar an

unidentified percentage of the "Net Proceeds," which the agreement defines as

"Gross Recovery minus Costs and Expenses." Nov. 4, 2022 Hr'g, Ex. 3 at § 2.

The agreement defines "Gross Recovery" as "the gross amount of any monies and

other forms of consideration received through monetization of the Patents" and

further provides that "Gross Recovery shall include, without limitation, any and all

settlement fees, licensing fees, fees from a sale, or other payment from other

transactions, as well as, any other proceeds (including assets) related to the

Patents." Nov. 4, 2022 Hr'g, Ex. 3 at § 2.

       The Consulting Agreement also provides that

> [f]or all Costs and Expenses relating to the monetization
> of the Patents, [Mavexar] shall advance such Costs and
> Expenses as one or more loans to [Mellaconic]. Such
> loans are reimbursable from Gross Recovery. In the
> event any such loan is not paid back in full from Gross
> Recovery, [Mellaconic] shall be responsible for full
> payment of all such loans. If [Mellaconic] fails to make
> such payment within 30 days following the termination
> of the final litigation filed pursuant to this Agreement,
> [Mavexar] shall have all available recourse pursuant to
> law to obtain recovery for such loans.
>
> Further, upon execution of this agreement, [Mellaconic]
> hereby grants to [Mavexar] a lien on any Gross
> Recovery, to the full extent permitted by Texas law, to
> secure [Mavexar's] Costs and Expenses reimbursable in
> accordance with this agreement.

Nov. 4, 2022 Hr'g, Ex. 3 at § 3. And finally, the Consulting Agreement states that

> [Mellaconic] is the sole owner and final decision maker
> on any and all decisions relating, either directly or
> indirectly, to the prosecution, litigation, licensing, and,
> more generally, monetization of the Patents.

Nov. 4, 2022 Hr'g, Ex. 3 at § 3.

Mr. Wernow asked Mr. Bui, "What's your recollection of [the Consulting Agreement] with respect to the recourse base repayment?"  Mr. Bui answered: "So Mavexar basically pays for the litigations of the—fees for litigations.  And then if all goes wrong, they have the right to come after me for the litigation fees."  D.I. 26 at 105:10–17.

Mr. Wernow then ended his examination of Mr. Bui as follows:

> Q. What do you do for Mellaconic IP, LLC, when you receive a complaint?
>
> A. I review it and I either confirm it or deny it.
>
> Q. And you can deny it, correct?
>
> A. I can deny it.

D.I. 26 at 106:21–25.

Neither this line of questioning nor the Consulting Agreement assuaged my concerns about the conduct of the lawyers before me and the role Mavexar was playing in the cases filed by Messrs. Pazuniak and Chong.  Mr. Bui may have said in response to Mr. Wernow's leading question that he could "deny" "a complaint" he received from Mavexar and the Consulting Agreement may have stated that Mellaconic "was the final decision maker" on all decisions relating to the monetization of the patents titled in Mellaconic's name, but Mr. Bui's testimony as a whole seemed to make clear that he did not "have any knowledge to object

70

against" Mavexar's advice and that he understood his role was as a "passive" rubber stamper of whatever Mavexar put in front of him.

Equally, if not more, troubling was Mr. Bui's testimony about his communications (or lack of communications) with the lawyers selected by Mavexar to represent Mellaconic. It was now undisputed that Mavexar was paying Mellaconic's attorney fees upfront. Mr. Bui had testified that he had had no communications with the lawyers selected by Mavexar to represent Mellaconic until after I had issued the September 2022 orders convening the November 4 hearing. But by the time I issued those orders, Messrs. Chong and Curfman had already filed voluntary motions to dismiss ten of Mellaconic's cases. (I would learn after the hearing that Mr. Wernow had been admitted *pro hac vice* to represent Mellaconic in six of the 19 related cases filed by Mellaconic and that counsel had moved to dismiss those six cases on or before November 2021.)

Model Rule 1.8(f) narrowly defines when an attorney may accept third-party payment for representing a client. It provides that

> [a] lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> > (1) the client gives *informed consent*;[10]

_____

[10] Informed consent refers to "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation

> (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
> (3) information relating to representation of a client is protected as required by Rule 1.6 [Confidentiality of Information].

MODEL RULES OF PRO. CONDUCT r. 1.8(f) (AM. BAR ASS'N 2022) (emphasis

added). These rigid requirements are critical "[b]ecause third-party payers

frequently have interests that differ from those of the client . . . ." *Id.* at r. 1.8(f)

cmt. Thus, "lawyers are prohibited from accepting or continuing such

representations unless the lawyer determines that there will be no interference with

the lawyer's independent professional judgment *and there is informed consent

from the client*." *Id.* (emphasis added).

Like Mr. Hall in Nimitz's cases, Mr. Bui appeared to have had no

communication with Mellaconic's lawyers before the complaints were filed, before

settlements were reached, and before voluntary dismissals of the cases were filed

in this Court. D.I. 26 at 91:17–93:18, 101:7–102:3. I did not, and do not as of this

date, understand how, in the absence of direct communication with Mr. Bui,

Mellaconic's lawyers could have determined that Mellaconic gave informed

---

about the material risks of and reasonably available alternatives to the proposed course of conduct." MODEL RULES OF PRO. CONDUCT r. 1.0(e) (AM. BAR ASS'N 2022).

consent to the initiation and settlement of the lawsuits brought in Mellaconic's
name in this Court. For that reason, I was and remain concerned that Messrs.
Chong and Curfman (and now, Wernow) did not act consistent with their
professional obligations under the Model Rules.

The Consulting Agreement also added to my concerns about Mavexar's role
in these cases and whether the assignment of the #328 patent to Nimitz recorded in
the PTO was a fiction. The Consulting Agreement between Mavexar and
Mellaconic looks to be a form agreement, and it provides that "the Client"—in this
case, Mellaconic—"agrees to maintain clear and exclusive title to the Patents, and
not incur any liens, encumbrances, or third[-]party claims with respect to the
Patents." Nov. 4, 2022 Hr'g, Ex. 3 at § 1. If Nimitz had a similar provision in its
agreement with Mavexar, that provision would seem to call into question the
validity of the assignment filed by an IP Edge email accountholder in the PTO that
purported to transfer to Nimitz all right, title, and interest in the #328 patent.

## XI.

I made this statement at the conclusion of the November 4 hearing:

> I think the testimony has to give pause to anybody who
> really is concerned about the integrity of our judicial
> system, the abuse of our courts, and potential abuse, lack
> of transparency as to who the real parties before the
> Court are, about who is making decisions in these types
> of litigation. But it's a lot to digest, and I may ask for

73

> supplemental briefing.  I'm actually considering inviting
> amici to come in to help.  And I would be open to
> receiving recommendations for amici.
>
> . . . If you have any recommendations for amici,
> please submit them no later than a week from today.
> And the cases are going to remain where they are, as I
> consider these issues.

D.I. 26 at 107:14–108:3.  I did not think it necessary to repeat at the hearing's

conclusion the concerns I had raised earlier in the hearing about whether counsel

had acted consistent with the Rules of Professional Conduct.

Believing that I needed more information to decide whether further action

was warranted to address these concerns and also to address counsel's admitted

failures to comply at the very least with the Disclosure Order, if not also the Third-

Party Funding Order, I issued on November 10 the Memorandum Order.

The Memorandum Order requires Nimitz, Mark Hall, and Mr. Pazuniak's

firm to "produce to the Court" (1) their communications with Mavexar and IP

Edge regarding (a) Nimitz's formation, acquisition of patents, and potential

liability for asserting those patents in these cases, (b) the #328 patent, and (c) the

initiation and settlement of the cases Nimitz filed in this Court; (2) retention letters

and/or agreements between Nimitz and Mr. Pazuniak's firm; (3) monthly bank

statements for any and all bank accounts held by Nimitz for the time period during

which it filed the 11 complaints asserting infringement of the #328 patent in this

Court; and (4) documents relating to Nimitz's use, lease, purchase, and/or retention

of 3333 Preston Road, STE 300, #1047, Frisco, TX 75034—the address alleged in

Nimitz's complaints to be its principal office.  The Memorandum also requires

Mark Hall to submit an affidavit in which he identifies the assets owned by Nimitz

as of the dates it filed the complaints in these four actions.

Notably, the Memorandum Order does not require Nimitz to docket these

records or otherwise make them public.  Thus, Nimitz is free to submit and to

publicly file at the time of its production of the records in question an assertion that

the records are covered by the attorney-client privilege and/or work product

doctrine and a request that for that reason (and perhaps other reasons) the Court

maintain the records under seal.

The records sought are all manifestly relevant to addressing the concerns I

raised during the November 4 hearing.  Lest there be any doubt, those concerns

are: Did counsel comply with the Rules of Professional Conduct?  Did counsel and

Nimitz comply with the orders of this Court?  Are there real parties in interest

other than Nimitz, such as Mavexar and IP Edge, that have been hidden from the

Court and the defendants?  Have those real parties in interest perpetrated a fraud on

the court by fraudulently conveying to a shell LLC the #328 patent and filing a

fictitious patent assignment with the PTO designed to shield those parties from the

75

potential liability they would otherwise face in asserting the #328 patent in litigation?

It cannot be seriously disputed that I had the inherent authority to order the production of these records and to invite the parties to submit names of potential amici to assist me in addressing the matters I have raised. "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812)). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).

The Supreme Court has expressly held that a federal court's inherent powers include the powers I have exercised here: "the power to control admission to its bar and to discipline attorneys who appear before it," *id.*, the power to enforce compliance with court orders, *see id.*, and "the power to conduct an independent investigation in order to determine whether [the court] has been the victim of fraud." *Id.* at 44. These powers extend to nonparties. *See Manez v. Bridgestone*

76

*Firestone N. Am. Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."); *Corder v. Howard Johnson & Co.*, 53 F.3d 225, 232 (9th Cir. 1994) ("[E]ven in the absence of statutory authority, a court may impose attorney's fees against a nonparty as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices." (citations omitted)).  And the Supreme Court has expressly approved the use of amici to help courts exercise these powers.  *See Universal Oil Prod. Co. v. Root Ref. Co.*, 328 U.S. 575, 580–81 (1946) ("[A] court that undertakes an investigation of fraud upon it may avail itself . . . of amici to represent the public interest in the administration of justice.").

These powers "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.  That is why I have proceeded incrementally—beginning with the testimony of only the named owners of the LLC plaintiffs at the November 4 hearing and then issuing the Memorandum Order compelling the production of a limited universe of documents directly relevant to the issues at hand.  I have not made definitive findings and will not make any adverse findings against a party without providing that party a full opportunity to be heard.

District judges can often point to a specific federal statute or the Federal Rules to explain their actions. "But if in the informed discretion of the court, neither [a] statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* at 50. I have so relied here.

November 30, 2022

CHIEF JUDGE